OPINION OF THE COURT
Michael J. Obus, J.
Late in the evening of October 18, 1988, Police Officer Michael Buczek was shot and killed as he and his partner tried to stop two men in the vicinity of Broadway and 161st Street in Manhattan. Unbeknownst to the officers, these two men were fleeing from a robbery. On January 12, 1989, a grand jury commenced an investigation into Officer Buczek’s death, at the outset of which the assistant district attorney asked the grand jurors to vote to extend their term for at least an additional four months. After hearing from 25 witnesses and receiving over 30 exhibits into evidence, which focused on the guilt of the defendant and Daniel Mirambeaux, both of whom had fled to the Dominican Republic immediately after the crimes, the *785 prosecutor, on March 30, 1989, asked the grand jury to consider, as to Mirambeaux only, charges of murder in the first degree; attempted murder in the first degree; two counts of murder in the second degree, intentional and felony murder; and robbery in the first degree. The panel voted a true bill.
The investigation continued, however, with the grand jurors repeatedly agreeing to extend their term, but hearing little evidence. In fact, the grand jury heard only from Florinda Almonte, the defendant’s ex-wife, on November 17, 1989. On December 13, 1989, the jurors were asked one last time to extend their term for an additional three months to hear from one final witness and although they agreed to do so, that witness, whose identity has never been disclosed, was not called and the grand jury never met again. It appears that the proceeding simply lapsed.
On October 22, 1998, the People presented the case against the defendant to a second grand jury without seeking court permission. Eleven witnesses testified at this proceeding, eight of whom had testified at the 1989 presentation. A ninth witness, a police detective, gave testimony comparable to that offered by a different police witness in 1989. The remaining evidence at the second presentation had been unavailable to the People in 1989. The grand jury indicted the defendant for a single count of murder in the second degree (Penal Law § 125.25 [3]).
Upon his extradition from the Dominican Republic in March of 2001, and his arraignment on the indictment, the defendant filed an omnibus motion seeking various relief, including dismissal of the charges on the grounds that there were procedural improprieties in the grand jury presentation, that he was improperly extradited and that the delayed prosecution deprived him of due process. The People filed a response to which the defense submitted a reply. Oral argument on the motion was heard on October 31, 2001. Additionally, on November 15, 2001, the court permitted the People, on notice to the defendant, to make an ex parte, in camera showing with respect to circumstances surrounding the preindictment delay and the interrelated need for a protective order regarding certain potential Brady material. (See Brady v Maryland, 373 US 83 [1963].) Thereafter, concerned that the People had acted without statutory authority when they presented the case against the defendant to the 1998 grand jury without court authorization, this court directed the parties to submit memoranda on this issue as well.
*786 Grand Jury
The defendant now contends that the 1998 grand jury presentation violated the dictates of Criminal Procedure Law § 190.75 (3), as interpreted by the Court of Appeals in People v Wilkins (68 NY2d 269 [1986]). In Wilkins, the prosecutor withdrew a case from the grand jury after presentation of the evidence, but prior to instructing the jurors on the law, and resubmitted it to a second panel without the consent of either the first grand jury or the court that impaneled it. Focusing on the policies underlying section 190.75, which “was enacted in order to curtail the ‘grave abuses’ resulting from the common-law rule that allowed a prosecutor to resubmit a charge repeatedly to successive Grand Juries after the same charge had been dismissed by their predecessors” (People v Gelman, 93 NY2d 314, 318 [1999]), the Court concluded that, although the People acted in good faith, the withdrawal was equivalent to a dismissal and that the People could not lawfully resubmit the charges without court approval. (Wilkins, 68 NY2d at 271.)
Preliminarily, the People seek to distinguish the Wilkins case, arguing that while the defendant here was concededly a suspect in 1989, the grand jury was more generally investigating the death of Officer Buczek. They point out that, unlike in Wilkins, there had been no arrests and there were no named defendants. However, Wilkins has been applied to just such a situation.
In People v Hemstreet (234 AD2d 609 [2d Dept 1996]), a grand jury commenced an investigation into the death of one Kenneth Hiep. After explaining to the jurors that no one had yet been charged with a crime and that they would decide at the conclusion of the evidence whether one or more people should be charged, the prosecutor presented evidence as to the guilt of Hemstreet and another individual, Patrick Bentz. Ultimately, the prosecutor, noting that the investigation was continuing, asked the grand jury to consider a charge of murder in the second degree only against Bentz. One year later, the People admittedly presented a “virtually identical” case against Hemstreet to a second grand jury without seeking leave of court. The defendant then moved to dismiss the indictment on the ground that the prosecutor’s withdrawal of the case from the first grand jury and the resubmission of the case to a subsequent grand jury without seeking leave of court violated section 190.75 (3). The trial court denied the motion. The Second Department reversed:
*787 “Where, as here, the prosecution has withdrawn an essentially completed case from the Grand Jury prior to any action having been taken by that body, the result will be deemed the functional equivalent of a dismissal under CPL 190.60 (4), and the prosecutor cannot resubmit the matter to a second Grand Jury without leave of court under CPL 190.75 (3) (see, People v Wilkins, 68 NY2d 269; Matter of McGinley v Hynes, 75 AD2d 897, rev’d on other grounds 51 NY2d 116, cert denied 450 US 918; People v McCann, 169 Misc 2d 253; People v Holmes, NYLJ, Aug. 18, 1992 [Sup Ct, NY County], at 22, col 3).” (Hemstreet, 234 AD2d at 610.)
Thus, Wilkins has been authoritatively held to apply to a presentation denominated a “grand jury investigation,” and to require dismissal of an indictment later secured in the absence of court authorization to re-present, where such a grand jury has failed to take any action pursuant to Criminal Procedure Law § 190.60 (4), that is, indict a person for an offense; direct the district attorney to file a prosecutor’s information with a local criminal court; direct the district attorney to file a request for removal to the Family Court; dismiss the charge before it; or submit a grand jury report.
Of course, not all inaction by a grand jury constitutes an unauthorized withdrawal amounting to dismissal. In the words of the Wilkins Court, “the extent to which the Grand Jury considered the evidence and the charge” is determinative. (68 NY2d at 274; see also Gelman, 93 NY2d at 314.) “ ‘Before a grand jury may be said to have acted upon a charge, there must be some indication that it knew about and considered the charge’ ” (Wilkins, 68 NY2d at 274, quoting People v Nelson, 298 NY 272, 276 [1948]), although the “presentation need not be complete for consideration equivalent to a dismissal to occur.” (Wilkins, 68 NY2d at 274, citing Mooney v Cahn, 79 Misc 2d 703 [Sup Ct, Nassau County 1974]; Matter of McGinley v Hynes, 75 AD2d 897 [2d Dept], revd on other grounds 51 NY2d 116 [1980], cert denied 450 US 918 [1981].) In the words of the Hemstreet Court, whether the People presented “an essentially completed case” is decisive. (234 AD2d at 610.)
Notwithstanding the People’s protestations to the contrary, for purposes of Wilkins, the prosecutor in this matter presented an essentially completed case in 1989. By their own admission at that time, the People were awaiting but one, albeit undisclosed, additional witness, when they allowed the proceeding to lapse. It is true that the People’s evidence against Daniel *788 Mirambeaux was stronger and that their election not to pursue the prosecution with respect to the defendant, who was the primary, if not the only remaining target of the proceedings, appears to have been a sound and good-faith exercise of their prosecutorial discretion. However, that does not alter the fact that an exhaustive presentation had already been effected. Nearly all of the witnesses who testified at the second presentation did so at the first. In essence, the 1998 presentation was a streamlined version of the initial presentation with one significant difference: the availability of additional evidence.[1] To be sure, that evidence may well be critical to the People’s success at a trial at which they must prove the defendant’s guilt beyond a reasonable doubt. But its absence does not undermine the “completeness” of the grand jury presentation. To recognize the validity of the People’s decision in 1989, to discontinue that presentation out of a well-reasoned concern that they could not prove the defendant’s guilt beyond a reasonable doubt to a trial jury, is not to say that the direct and circumstantial evidence they had already presented would not support an indictment. For, indeed, at the initial presentation there was legally sufficient evidence to establish that the defendant committed the crime of murder in the second degree (Penal Law § 125.25 [3]), and competent and admissible evidence provided reasonable cause to believe that the defendant committed such offense. (See CPL 190.65 [1].) Under these circumstances, it can only be concluded that the People withdrew an “essentially completed” case from the 1989 grand jury. (Compare Gelman, 93 NY2d at 314; People v Dym, 163 AD2d 150, 154 [1st Dept], lv denied 76 NY2d 892 [1990]; People v Rodriguez, 281 AD2d 375, 376 [1st Dept], lv denied 96 NY2d 906 [2001].)
It is of course possible that the first grand jury, had it been given the opportunity to act pursuant to statute, might have dismissed the charge as to this defendant. (See People v Wilkins, 68 NY2d at 276; Hemstreet, 234 AD2d at 610.) Nevertheless, leave to resubmit would undoubtedly have been granted had it been sought in 1998, given that the basis for the resubmission was material evidence not earlier available. It is accordingly unfortunate that dismissal of the indictment is required now, at this late date, not by extension of Wilkins, but by its necessary application. Leave to re-present is granted.
*789 In view of the ruling that the People may re-present this matter, the court will address the other contentions of the defendant seeking outright dismissal of the charges.
Preindictment Delay
The defendant also moves to dismiss the indictment on the ground that the 10-year delay from the time of Police Officer Michael Buczek’s homicide in October of 1988, to the defendant’s indictment on a charge of murder in the second degree in November of 1998, violated his right to due process.
In essence, the defendant claims that the delay between the commission of the crime and his indictment was unreasonable, without good cause and has prejudiced his defense. In support of his claims, the defendant contends that some witnesses who selected the defendant’s photograph in 1989, did not do so in 1998; therefore, “[a]rguably potentially exculpatory information” has been lost. (See Mem of Law in Support of Pretrial Motions of Pablo Almonte at 18.) In addition, the defendant asserts that he has been prejudiced by the loss or destruction of certain vehicles that were in the possession of the police in 1989. Moreover, inasmuch as the People were able to indict and extradite the alleged shooter in this case, Daniel Mirambeaux, in 1989, the defendant argues that their failure to do so with respect to him must be the result of prosecutorial negligence at best.
The People counter that prior to the unexpected availability of material evidence in 1998, they did not have sufficient proof to establish the defendant’s guilt beyond a reasonable doubt at a trial. Furthermore, the People aver that none of the defendant’s claims of prejudice are persuasive.
In 1971, the United States Supreme Court recognized that, in addition to any applicable statute of limitations, the Due Process Clause of the Fifth Amendment to the United States Constitution affords a defendant some further protection against preindictment delay. (See United States v Marion, 404 US 307, 324 [1971].) Nevertheless, it was not until 1977 that the Court first considered the circumstances in which due process requires that an indictment be dismissed due to a delay between the commission of an offense and the initiation of prosecution. (See United States v Lovasco, 431 US 783, reh denied 434 US 881 [1977].) Proof of prejudice to the defendant is generally necessary, although standing alone, not dispositive of such a claim. (Id. at 789-790; see also Marion, 404 US at 324-325.)
*790 As the defendant notes, the New York State Court of Appeals has held that the state due process requirement of a prompt prosecution is broader than its federal counterpart. (See People v Singer, 44 NY2d 241, 253 [1978].) Thus, “[i]n a proper case, a lengthy and unjustifiable delay in commencing the prosecution may require dismissal even though no actual prejudice to the defendant is shown.” (Id. at 253-254, citing People v Staley, 41 NY2d 789 [1977]; People v Winfrey, 20 NY2d 138 [1967]; see also People v Lesiuk, 81 NY2d 485, 490 [1993].) It is the prosecutor’s burden to establish good cause excusing such a delay. (Singer, 44 NY2d at 254, citing People v Prosser, 309 NY 353 [1955]; Lesiuk, 81 NY2d at 490.)
In balancing the merits of a defendant’s claim of unjustified prosecutorial delay, whether the delay is preindictment or postindictment, the Court of Appeals has identified the following relevant factors: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charges; (4) whether there has been an extended period of pretrial incarceration; and (5) whether there is any indication that the defense has been impaired by reason of the delay. (See People v Taranovich, 37 NY2d 442, 445 [1975]; see also People v Vernace, 96 NY2d 886, 887 [2001]; People v Bryant, 65 AD2d 333, 336 [2d Dept 1978], appeal dismissed 46 NY2d 1037 [1979].) No one factor or combination of factors is dispositive. (Taranovich, 37 NY2d at 445.) Similarly, the Court “has steadfastly refused to set forth a per se period beyond which a criminal prosecution may not be pursued.” (Id., citing Prosser, 309 NY at 357.) The decision is ultimately fact sensitive. (See, e.g., Vernace, 96 NY2d at 887; Taranovich, 37 NY2d at 445; Prosser, 309 NY at 357, citing People v Hall, 51 App Div 57, 62 [4th Dept 1900].) In the matter at bar, when the Taranovich criteria are analyzed and fully balanced within the factual confines of the case, the conclusion that the defendant’s due process rights have not been violated is inescapable.
The preindictment delay in this case, 10 years, is certainly extensive and thus warrants the court’s careful scrutiny. Nonetheless, the defendant stands charged with a class A-I felony, murder in the. second degree, for the slaying of a police officer while fleeing from a robbery. As the defendant concedes, few if any crimes are more serious. Also critical in this context is the reason for the delay: a lack of proof that effectively precluded an earlier prosecution. In this regard, it must be noted that even after probable cause exists, prosecutors are under no obligation to file charges before they are satisfied that they will *791 be able to establish guilt beyond a reasonable doubt. (E.g., Lovasco, 431 US at 791; People v Hoff, 110 AD2d 782 [2d Dept], lv denied 65 NY2d 981 [1985].) Indeed, there is no constitutional requirement that charges be filed promptly once there is sufficient evidence to prove guilt, but before the investigation of the entire criminal transaction is complete. (Lovasco, 431 US at 792-795; see also Singer, 44 NY2d at 254; People v Bryant, 79 AD2d 867, 869 [4th Dept 1980]; People v Rodriguez, 281 AD2d 375 [1st Dept], lv denied 96 NY2d 906 [2001].)
The parallels between this case and the Hoff prosecution, in which the defendant was indicted some 25 years after he first fell under suspicion for a homicide, are striking. The police in Hoff had a good-faith basis to believe they lacked sufficient evidence to successfully prosecute the defendant, who had immediately retained counsel once cast under suspicion at about the time of the murder in 1954. In 1979, two telephone calls to the police, in which the anonymous caller related that the defendant had confessed his guilt to the homicide, stimulated new interest in the old case. (Id. at 783.) Rejecting the defendant’s claim that his due process rights were violated by the intervening 25-year lapse in prosecution, the Court held that the investigative delay was justified and did not appear to have been engineered by the police to gain a tactical advantage. (Id.)
In the case at bar, the “revival” of which was prompted by the unexpected availability of material evidence in 1998, there similarly is no merit to the suggestion that the 10-year delay was in bad faith or designed to gain a tactical advantage. There simply is no such advantage. As earlier noted, this court’s review of the minutes of the 1989, as well as the 1998 grand jury presentations, substantiates the People’s belief that, prior to the surfacing of the additional witness, they had insufficient evidence with which to convince a petit jury of the defendant’s guilt of the murder of Officer Buczek beyond a reasonable doubt. It also dispels the defense notion that the proof against the defendant and Daniel Mirambeaux was comparable. It was not. There remained, until 1998, substantially more evidence against Mirambeaux.
The final significant factor requiring review is whether the defense has been impaired by the delay. While the defendant asserts that the release or destruction of various vehicles he posits were in the custody of the police in 1988 or 1989 is but one example of the prejudice his defense has suffered due to the delay in prosecution, he has failed to state just how the *792 unavailability of forensic evidence has frustrated it. Moreover, it is by now well settled that the loss or destruction of evidence does not necessarily require the drastic remedy of dismissal (see, e.g., People v Haupt, 71 NY2d 929 [1988]; People v Bay, 67 NY2d 787 [1986]; People v Kelly, 62 NY2d 516 [1984]), although, in a given case, it may entitle the defendant to a sanction at trial. However, even such a limited sanction is unlikely here, where the alleged loss or destruction of the evidence, not remotely shown to have been favorable to the defense, occurred years before the People had enough evidence to confidently prosecute the defendant.
Simply put, all of the defendant’s assertions of prejudice are wholly speculative and unsupported by factual allegations. Indeed, he acknowledges as much when, in discussing the witnesses who identified his photograph in 1989, but not in 1998, he states that “[ajrguably, potentially exculpatory information known to that witness is now lost whereas in 1989, an attorney or an investigator may have been able to use that information in Mr. Almonte’s defense.” (See Mem of Law in Support of Pretrial Motions of Pablo Almonte at 18 [emphasis supplied].)
It remains to be noted that the defendant has not been subjected to the tribulations of formal accusation that the Marion Court recognized. (Marion, 404 US at 320; see also Lovasco, 431 US at 791; Vernace, 96 NY2d at 888.) Having fled to the Dominican Republic within hours of the homicide in 1989, and resided there until his extradition in 1998, the defendant was not subjected to a prolonged period of pretrial incarceration. Likewise, there is no claim that defendant’s liberty was otherwise interfered with, that his employment was disrupted, that his financial resources were drained, that his associations were curtailed or that anxiety was created in his family or his friends. (Id.) Thus, the delay in prosecution cannot be said to have impaired the defense to the degree that would warrant dismissal. (See Singer, 44 NY2d at 254 [“a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reason, will not deprive the defendant of due process even though the delay may cause some prejudice to the defense”]; Lovasco, 431 US at 796; Bryant, 79 AD2d at 869; Rodriguez, 281 AD2d at 375.)
On balance, given the nature of the underlying charge, the reasons for the delay, as well as the lack of pretrial incarceration, tribulations associated with formal accusation or substantial prejudice to the defense, the 10-year hiatus between the *793 murder of Police Officer Buczek and the indictment of the defendant did not serve to violate his due process rights. The defendant’s motion to dismiss on the ground of preindictment delay is therefore denied in all respects, including his alternative request for a hearing on the matter.
Extradition
The defendant’s motion to dismiss the indictment on the ground that the court lacks jurisdiction over his person is also denied. The defendant asserts that “[t]he prosecution has deliberately, unnecessarily and unreasonably subverted his exercise of the constitutional rights imputed to him through the Extradition Treaty between the United States and the Dominican Republic” by bringing him to New York before he had exhausted his right to appeal as provided under Dominican law. (See Defendant’s Mem of Law at 2.) Assuming, without deciding, that the defendant’s extradition to New York prior to the completion of a purported appellate process in the Dominican Republic violated Dominican law, a fatal flaw in his argument is the absence of any basis for concluding that any such violation was orchestrated by the United States Government.
To begin, the defendant was returned to the United States by virtue of the bilateral treaty between this country and the Dominican Republic. (See Treaty on Extradition, June 19,1909-Aug. 26, 1910, United States-Dominican Republic, 36 US Stat 2468, TIAS No. 550.) Unlike the facts of the cases upon which the defendant partially relies, there was no abduction, no kidnapping here (see United States v Toscanino, 500 F2d 267 [2d Cir], reh denied 504 F2d 1380 [1974]; United States v Alvarez-Machain, 504 US 655 [1992] [permitting prosecution nonetheless]; Ker v Illinois, 119 US 436 [1886]; Frisbie v Collins, 342 US 519, reh denied 343 US 937 [1952]), and certainly no conduct that could be construed as outrageous or that would “shock the conscience.” (See Toscanino, 500 F2d at 273, citing Rochin v California, 342 US 165, 172-173 [1952]; People v Isaacson, 44 NY2d 511, reh denied 45 NY2d 776 [1978].)
It is true that pursuant to the treaty and the laws of this state, this court may review the conduct of our law enforcement and government officials in the extradition context (see People v Walls, 35 NY2d 419 [1974], cert denied 421 US 951 [1975]), and it does have the authority to decline jurisdiction in an appropriate case. (See Alvarez-Machain, 504 US at 655.) However, the defendant has utterly failed to set forth the conduct of any United States official that he finds objection *794 able,[2] his repeated characterization of “deliberate” or “forcible” actions notwithstanding. Indeed, it appears that the only questioned act on the part of our government or law enforcement officials was to accept the defendant into custody pursuant to the authority of a decree of the President of the Dominican Republic ordering extradition, a decree to which the defendant barely refers.
The Treaty does provide that upon a determination by a magistrate or judge of the surrendering nation that there is “sufficient [evidence] to sustain the charge, it shall be the duty of the magistrate to certify [that finding] to the proper executive authority” of the surrendering state who may then issue the order for the fugitive’s surrender to the demanding state. (Treaty, 36 US Stat 2468, TIAS No. 550, art XI, para 3.) That is precisely what happened here. Neither the treaty itself, however, nor for that matter the Dominican statutes appended to the defendant’s motion papers, provide, by their terms, for appellate review of these determinations.
Certainly this court is not required, as the defendant contends, to interpret the Treaty provision for a finding of “sufficient evidence” to incorporate all procedural due process requirements of Dominican law and to construe such law as necessarily including a right to appeal. Indeed, there is no such requirement under American due process jurisprudence. (See, e.g., Griffin v Illinois, 351 US 12, 18, reh denied 351 US 958 [1956] [“It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all”], citing McKane v Durston, 153 US 684, 687-688 [1894].)
In any event, such a review by this court would be completely at odds with the act of state doctrine which, as the defendant correctly conceded in oral argument, preempts this court from reviewing another sovereign’s conduct under its own laws. (See, e.g., Underhill v Hernandez, 168 US 250, 252 [1897] [“Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done, *795 within its own territory”]; Kirkpatrick & Co. v Environmental Tectonics Corp., Intl., 493 US 400 [1990]; Banco Nacional de Cuba v Sabbatino, 376 US 398 [1964].) In short, the defendant’s complaint, if any, lies with the Dominican government’s actions with respect to Dominican law.
Accordingly, the defendant’s motion to dismiss the indictment for want of jurisdiction and his alternative request for a stay pending completion of the appeals process in the Dominican courts is denied in full.
Brady Material
For the reasons set forth on the record in the ex parte, in camera proceeding held on November 15, 2001, the court is not requiring the People to disclose, at this time, any additional information concerning the “new” evidence that was unavailable to them prior to 1998 as potential Brady material. (See Brady v Maryland, 373 US 83 [1963]; In re United States, 267 F3d 132 [2d Cir 2001].)
Decision with respect to the balance of the applications in the defendant’s omnibus motion is reserved pending representation of the matter to a new grand jury and the defendant’s arraignment on any ensuing indictment.

. The People’s application for a protective order to prevent the disclosure of this evidence at this time is being granted. (See at 795 infra.)

. Counsel does make reference, in his statement of facts, to an alleged report in the March 19, 2001 edition of the Daily News where the supervisor of the United States Marshals is purported to have said something to the effect that the United States withheld a $3 million naval vessel from the Dominican Republic in an effort to pressure the Dominican government to send the defendant to New York. The claim is speculative at best and does not alter the fact that, as of the time of extradition, a sufficient basis therefor clearly existed.