■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAWRENCE DYM, Appellant.—Judgment, Supreme Court, New York County (Eve Preminger, J., at motion to dismiss indictment; Richard T. Andrias, J., at trial and sentencing), rendered January 5, 1989, after jury trial, convicting defendant of eight counts of grand larceny in the second degree (Penal Law former § 155.35) and one count of scheme to defraud in the second degree (Penal Law § 190.60) and imposing concurrent terms of six months' incarceration and of 4½ years' probation on each larceny conviction, with a condition that defendant be subjected to house arrest during the first 1½ years of probation, together with a fine of $5,000 as to each larceny conviction, and imposing a conditional discharge on the scheme to defraud conviction, unanimously affirmed.

Defendant was president of Gabriel Management, a managing agent for some 35 cooperative and condominium apartment buildings. In 1983 Dym devised a scheme to charge fraudulent fuel bills invoiced by a fictitious fuel company to certain of these cooperatives. The prosecution arose following two Grand Jury investigations. The first named a "John Doe" and was withdrawn by the People after preliminary background information was presented. The second named the defendant and resulted in his indictment. The defendant's accomplice testified for the People in the later proceeding. Defendant's motion to dismiss the indictment, on the grounds that this investigation constituted a resubmission without court authorization, was denied. A later motion to set aside the verdict on the basis of newly discovered evidence, pursuant to CPL 330.30 (3), also was denied.

The trial evidence established that Gabriel Management, under the defendant's supervision, paid fuel bills for its cooperative/condominum clients. Among these clients were 1270 Fifth Avenue, 205-54 House, Southridge Cooperative, University Towers and River Terrace. Eloy Garcia was superintendent and Gloria Harvey was the corporation's treasurer at Southridge. Benito Diaz was superintendent at 1270 Fifth Avenue. Harvey and Garcia testified that when fuel was delivered to Southridge, Garcia, who did not see the actual bill, would sign for delivery. The bill then would be sent to Gabriel for payment. The defendant maintained a separate checking account for each cooperative. Gabriel Management

maintained the check books and from 1983 to 1985 only defendant was authorized to sign checks. At Southridge, 1270 Fifth Avenue and 205-54 House the checks had to be counter-signed by a member of the cooperative's board of directors. After the defendant signed the check, it would be forwarded, along with the bill, to the cooperative for the second signature.

Diaz testified that at 1270 Fifth Avenue the oil tank held 18,000 gallons. Garcia testified that Southridge had two tanks totaling 18,000 gallons. Garcia would inform Marie Hogan, Gabriel's office manager, of oil needs and defendant would place the order for fuel. Both Diaz and Garcia testified as to the ordinary fuel needs of their buildings during winter and summer months. The usual oil supplier for both buildings was All-Boro Fuel Oil Company.

John Moraites, defendant's accomplice, testified that in 1983 he received the contract for painting and carpentry work at Southridge, subject to a 10% kickback to a Gabriel partner. Defendant thereafter monopolized Gabriel Management's relationship with Moraites. Moraites received more work and made kickbacks directly to defendant. According to Moraites, in October 1983 defendant proposed that they establish a fictitious oil company which would bill the cooperatives for full load deliveries. Moraites then set up Lugo Fuel Corporation, obtained a certificate of doing business in the name of Lugo Fuel, opened a checking account in the name of Lugo Fuel, and printed letterhead stationery and oil delivery tickets. Only Moraites' name appeared on these documents and the fictitious business operated out of one of Maraites' companies. Moraites testified that commencing in January 1987, he and the defendant began to submit Lugo Fuel bills to Gabriel's clients. Defendant instructed him how to prepare the bills and delivery tickets, including providing him with the dates, number of gallons and price per gallon. On certain occasions Moraites made mistakes in arithmetic and defendant corrected them. Defendant, who received the bills, controlled when the bills would be presented to the cooperatives for payment. Moraites never signed delivery tickets and prepared bills only at the defendant's instruction. Defendant gave a signed cooperative check to Moraites, often immediately, and Moraites gave defendant half of the proceeds.

Defendant signed seven checks to Lugo Fuel Corporation from the 1270 Fifth Avenue account, totaling $38,117.65. Diaz testified that his name was forged on Lugo Fuel delivery tickets. Defendant signed 13 checks to Lugo Fuel from the

Southridge account each in excess of $5,000. Hogan, the office manager, testified that she did not recall seeing a Lugo Fuel bill and Garcia testified that he had not heard of the company during the period of the alleged deliveries. Some of the corresponding delivery tickets seem to have on them photocopied meter numbers from an All-Boro delivery ticket. These documents were all introduced in evidence by the People. Garcia testified that when his name appeared on a Lugo Fuel delivery ticket, it was forged. Moraites testified that he had not signed delivery tickets.

At 205 West 54th Street, or 205-54 House, in response to Lugo Fuel bills, defendant signed two checks for approximately $5,200 each. Defendant also signed checks in response to seven Lugo Fuel bills on the Long Island University Towers account. On one such bill the price had been corrected and a notation on the bill in the defendant's handwriting states "Incorrect, I called, they agree." The same scheme was repeated at 94-11 69th Avenue and at River Terrace apartments.

In all, Lugo Fuel submitted 37 bills and defendant signed checks totaling $183,276.29. Moraites testified that he kept $70,000 or $80,000 and that the remainder was given to the defendant. The checks were, for the most part, deposited in a Lugo Fuel bank account.

Defendant's scheme was uncovered after officers of certain of the cooperatives discovered billing discrepancies. Defendant personally insisted on the accuracy of certain of the bills and stated that he personally had arranged for deliveries by Lugo Fuel and personally had accepted delivery slips. One cooperative officer, in reviewing defendant's books, discovered that Lugo Fuel regularly made deliveries within four days of, and occasionally made deliveries on the same day as, deliveries by All-Boro Fuel Oil Company. Diaz testified that his own fuel log recorded no deliveries by Lugo Fuel.

Garcia testified that when he returned from a two-week vacation in July 1985, his fuel records and invoices were missing from his office. Garcia indicated that only he, the defendant, a handyman, and one other person had keys to his office. Diaz recorded a telephone conversation with defendant, a transcript of which was introduced into evidence. During this conversation the defendant complained that Diaz, in his relations with cooperative officials, was being "too positive" in stating that Diaz had logged all fuel deliveries and that Lugo had never delivered fuel. Defendant continued "as long as we

stick together, nobody can hurt us about anything" and that "the only way they can get me is if Benny Diaz stands up and says I am absolutely positive". Defendant stated that if Diaz were more equivocal in his statement to coop officers, defendant would be "outta the problem." During September and October of 1985, defendant abrogated an agreement to arrange a sit down between a Lugo Fuel representative and cooperative officers. Moraites testified that the defendant recommended that he consider a long vacation in Greece. In the spring of 1986 Moraites entered into a cooperation agreement with the District Attorney.

Defendant's guilt was proved beyond a reasonable doubt. There was sufficient corroborative evidence, independent of Moraites' testimony, tending to connect defendant with the crime. (CPL 60.22 [1].) Corroborative evidence need not bolster the details nor rise to the level of conclusive proof. *(People v Hudson,* 51 NY2d 233, 238.) It need not lead only to an inference of guilt. *(People v Kohut,* 30 NY2d 183, 193-194 [1972]; *People v Bretti,* 68 NY2d 929, 930 [1986].) Such corroborative evidence may be of a seemingly insignificant nature but " 'may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime' " *(People v Moses,* 63 NY2d 299, 306 [1984], quoting *People v Dixon,* 231 NY 111, 117). Corroborative evidence was supplied by each of the other witnesses, as well as by bills, delivery tickets, other records and by the defendant's own admissions. The defendant handled all the cooperatives' fuel oil affairs including ordering fuel and authorizing payment. Evidence established that Lugo Fuel was a shell and that no deliveries were made by it despite defendant's personal guarantees to the contrary. Diaz also provided evidence of defendant's clandestine attempt to cover up his involvement in the scheme. *(People v Potenza,* 92 AD2d 21, 29 [4th Dept 1983].) Hence, sufficient evidence was introduced to corroborate Moraites' testimony both as to the larcenies and scheme to defraud.

Defendant's challenge to the court's instruction that Moraites was an accomplice as a matter of law and as to the principles of corroborative evidence is meritless. The instruction tracks the language of 1 CJI(NY) 7.52. The fact that defendant preferred other language did not require its substitution. *(People v Dory,* 59 NY2d 121, 129 [1983].)

Summary denial of defendant's motion to set aside the verdict was also proper as the motion failed to satisfy CPL 330.30 (3). The affidavits submitted by defendant did not

establish that the claimed evidence was newly discovered *(People v Zambrana,* 142 AD2d 744, 745 [1988], *lv denied* 73 NY2d 898 [1989])* or that defendant exercised due diligence in securing the purportedly missing witness *(People v Davis,* 43 NY2d 17, 28 [1977], *cert denied* 435 US 998 [1978]; *People v Zambrana, supra).* Defendant submitted the affidavit of Lloyd L. Tyndale, a former superintendent the buildings managed by Gabriel Management, stating that in the winter of 1983 he observed a green oil truck and was told by the drivers that they were delivering for Lugo oil. However, the defendant concedes that he and his counsel were aware of this "evidence" prior to trial and the defendant makes no claim that he experienced difficulty in locating Mr. Tyndale or in securing his appearance at trial. Moreover, the probative value of Mr. Tyndale's anticipated testimony would have been slight at best since his affidavit does not state that oil was actually delivered. Defendant's papers, therefore, failed to present sworn allegations of fact sufficient to support the motion. (CPL 330.40 [2] [e] [ii].)

Finally, under the standard set forth in *People v Wilkins* (68 NY2d 269 [1986]), we conclude that the termination of the first Grand Jury proceeding was not a dismissal. The first proceeding was investigatory rather than specifically directed at the defendant. The first Grand Jury heard only three witnesses. Maraites testified only at the second proceeding. The first witness merely delivered Gabriel Management documents including Lugo Fuel Corporation bills, delivery tickets and checks. The other two witnesses were Gabriel employees who offered background information concerning the procedures and operations of Gabriel. No evidence was presented regarding nondelivery by Lugo Fuel. Thus, before the case was withdrawn, that panel did not hear evidence that a crime had been committed. *(Compare, People v Skolnik,* 135 Misc 2d 964 [1987]; *Matter of McGinley v Hynes,* 75 AD2d 897 [2d Dept 1980], *revd on other grounds* 51 NY2d 116 [1980], *cert denied* 450 US 918.) As such, judicial authorization was not required for resubmission. (CPL 190.75 [3].)

We have reviewed defendant's remaining contentions and find them to be without merit. Concur—Kupferman, J. P., Sullivan, Asch, Wallach and Smith, JJ.