[892 NYS2d 359]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAKEDA DAVIS, Appellant.

First Department, January 5, 2010

### APPEARANCES OF COUNSEL

*Mark L. Freyberg*, New York City, and *Joel G. Kosman*, New York City, for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Susan Gliner* of counsel), for respondent.

### OPINION OF THE COURT

RENWICK, J.

Following an interview with the complainant, who knew both of her alleged assailants, the police arrested the codefendant, but were initially unsuccessful in arresting defendant. In the ordinary course of business, the People presented the case against the codefendant to the grand jury. Although the prosecutor indicated at the outset of the grand jury proceedings that she was submitting the case against the codefendant and made no mention of defendant, the prosecutor elicited detailed testimony from the complainant about the roles in the assault played by both persons, each of whom was identified by name. The police arrested defendant three days after the complainant testified. One week later, on the last day of the grand jury's term, the prosecutor advised the grand jurors that she was withdrawing the case. Several months later, without requesting authorization under CPL 190.75 (3), the prosecutor re-presented the case to a second grand jury, which, after hearing testimony from the complainant and additional witnesses, indicted both defendant and codefendant. Under these circumstances, the re-

submission of defendant's case to a second grand jury without leave of court violated the proscription of CPL 190.75, and the indictment that followed should be dismissed.

This matter stems from a nightclub fight that took place on June 11, 2006, between the complainant Lynn Walker, defendant Makeda Davis and her friend, codefendant Fayola McIntosh. The next day, the police arrested McIntosh. On June 20, 2006, the Assistant District Attorney (ADA) who appeared before the grand jury announced that she was presenting three felony charges against McIntosh: two counts of assault in the first degree and one count of assault in the second degree. The ADA then advised the grand jury that, while it would hear from the victim, Walker, that day, the case would be continued at a later date.

During the first grand jury proceedings, the ADA elicited testimony from Walker about being assaulted by defendant and McIntosh. In particular, Walker testified that on June 11, 2006, she was in the nightclub when, at about 2:00 A.M., she had an argument with defendant that ended in a physical fight that was broken up by club security. Approximately 30 minutes later, defendant walked by Walker and "swiped something at [her] face." Walker, however, could not identify what defendant had supposedly "swiped." "I really didn't see exactly what it was. It was just some type of object in her hand . . . She did not touch me with it. She just put it like right here."

After swiping the object at Walker's face, defendant began to hit her. Defendant then "grabbed [Walker's] hair" and started to punch her on the left side of her face. At that point, McIntosh came over and hit Walker on the right side of her forehead, and then continued hitting her in the back. Walker did not see whether McIntosh had anything in her hand when she struck her. After a crowd gathered, defendant cut Walker's hair. Once the fight had been broken up, Walker "felt a lot of blood running down" her face and "a big gigantic red just blot on [her] dress." Immediately thereafter, Walker went to the hospital and received 40 stitches to her forehead, the left side of her face, "behind [her] ear," as well as a liquid stitch on her hand. Walker received pain medication and was unable to return to work after the accident. During her testimony, she took off her head scarf and showed the grand jury her injuries, specifically pointing to her "cut[s]." Photographs of Walker's "cuts" taken the day of the grand jury proceedings were submitted in evidence.

At the conclusion of the presentation of the complainant's testimony, the ADA asked the grand jurors if they had any ques-

tions, which they did. The grand jurors asked Walker if she had seen the hands of defendant and McIntosh at the time they fought with her. Addressing herself first to defendant's conduct, Walker said:

"Well, her hand was closed, so, I mean, it looked like a little whiteness on it, then something. It looked like her whole hand was around whatever it was. Maybe it might have been long, maybe it fit in her whole hand, or maybe it had a little handle, but I didn't see it."

When asked by grand jurors whether she saw if McIntosh had an object in her hand, Walker replied, "No . . . when she hit me, I just did not see that coming, so I was not looking at her." In response to other questions from grand jurors, Walker further testified that, when defendant and McIntosh were striking her, she was striking them back "[w]ith my fists."

Walker was excused and no further evidence was presented. Three days later, defendant voluntarily surrendered to the police. Seven days later, on June 30, 2006, the last day of the grand jury's term, the ADA advised the grand jury that she was withdrawing the case due to "witness unavailability."

Approximately four months later, in October of 2006, the ADA, without requesting judicial leave, appeared before a second grand jury to present evidence in the case against defendant and McIntosh. The same three felony charges from the first grand jury were submitted to the second grand jury. Walker again testified about the assault and again stated that defendant "swiped an object in front of [her] face." When asked whether she could see what the object was, Walker replied, "Not really. I mean, it looked like some type of blade, but I couldn't really see it because she did it real fast, like jumping at me."

When the prosecutor asked Walker what she "fe[lt]" when she was being "struck," Walker replied, "when [defendant] hit me on the side of my face, I just felt, like, a drag. Like, it was just, like. And then, her hand kind of drug down my face. It didn't feel like she hit me. And that was it. I felt it kind of drug. And the same thing, really, on this side of my face when Fayola ran over." Walker indicated that she "started getting a little blurry" and "pretty much started bleeding after that."

The rest of Walker's testimony was similar to her testimony before the first grand jury, except she indicated that she had scarring and that her scars were still visible. The photographs of Walker's injuries, taken nine days after the incident, were

again admitted into evidence. In addition to Walker, two other witnesses testified before the second grand jury. Barbara Smith, Walker's friend, testified that she observed defendant and McIntosh cut Walker with razors.

Dr. Sandra Haynes, an attending physician at St. Vincent's Hospital, testified that, on the day of the incident, she examined and treated Walker. Dr. Haynes indicated that she had reviewed Walker's medical records pertaining to her treatment at St. Vincent's, and the records were admitted into evidence. Dr. Haynes described Walker's injuries and treatment, which included stitches, and testified that, with "a reasonable degree of medical certainty," Walker's lacerations "were consistent with injury caused by a sharp instrument." When asked what the possible long-term effects were from those lacerations, Dr. Haynes replied that Walker "will have permanent scarring."

After the second grand jury presentation, defendant and McIntosh were indicted on two counts of first-degree assault and a single count of second-degree assault. Before the charges against the codefendant were severed, defendant, without the benefit of seeing the transcript of the first grand jury proceeding, moved, in an omnibus motion, to inspect the grand jury minutes and to dismiss the indictment against her on the ground that the evidence was legally insufficient to support the indictment. Defendant also requested that the court determine, among other things, whether "the presentation of evidence [was] withdrawn prior to a vote being taken and then resubmitted." Supreme Court granted the motion to inspect the grand jury minutes, but denied the motion to dismiss the indictment or reduce the charges, finding that the grand jury evidence was legally sufficient to support the charges and that the proceedings were properly conducted.

Prior to severance, the codefendant also moved to dismiss the indictment against her on the ground that the People had improperly failed to seek judicial authorization before presenting the case to the second grand jury. Defendant did not join in that motion. Supreme Court denied the motion, finding that the judicial authorization was not necessary under the circumstances of the case. After severance, the jury convicted defendant of two counts of assault in the first degree and one count of assault in the second degree. Supreme Court sentenced defend-

ant to an aggregate prison term of 9½ years, to be followed by five years of postrelease supervision.*

On appeal, defendant asserts that since the People's case was essentially complete at the time that it was withdrawn from the first grand jury, the withdrawal constituted a dismissal of the charges, and thus the People were required to obtain leave to re-present the case to the second grand jury. The People counter that defendant's argument with respect to the improprieties in the grand jury proceedings is unpreserved. The People further aver that, on the merits, the argument should be "summarily rejected" because "the first grand jury heard evidence in the case against McIntosh alone" and "never even heard evidence that was directed at defendant as the target." Finally, the People assert that even if defendant was the subject of the first grand jury presentation, judicial authorization was not required before presenting this case to the second grand jury because there was insufficient evidence for the first grand jury to make a decision about "essential elements of the crimes with which defendant was being charged."

■ Preliminarily, it must be pointed out that the People cannot seriously argue that defendant has failed to preserve her claim that her indictment upon resubmission to a grand jury without proper leave of court violated CPL 190.75 (3). The People point out that defendant did not join in the codefendant's motion to dismiss the indictment on the ground that the prosecutor improperly re-presented her case without court approval. However, since defendant requested in her omnibus motion that the court determine whether "the presentation of evidence [was] withdrawn prior to a vote being taken and then resubmitted," it is clear that the issue has been adequately preserved (*cf. People v Brown*, 81 NY2d 798 [1993] [defendant failed to preserve his claim that the grand jury proceeding was defective since he did not specify, in his omnibus motion, the grounds now claimed]; *People v Julius*, 300 AD2d 167, 168 [2002], *lv denied* 99 NY2d 655 [2003] [defendant failed to preserve his claim that prosecutor improperly re-presented his case to the grand jury]).

> "CPL 190.75 (3) prohibits the District Attorney's office, without leave of court, from resubmitting a charge that has been previously dismissed by the-

---

* At a separate trial, a jury convicted codefendant McIntosh of assault in the second degree. Supreme Court sentenced her to a five-year prison term.

[g]rand [j]ury. The statute was enacted to curb abuses that resulted from the common-law rule that allowed prosecutors to resubmit charges to successive [g]rand [j]uries ad infinitum until one voted an indictment" (*People v Montanez*, 90 NY2d 690, 693 [1997], citing *People v Wilkins*, 68 NY2d 269, 273 [1986]).

Thus, "District Attorneys are allowed only one bite at the apple; if unsatisfied with the [g]rand [j]ury's dismissal of a charge, they must seek leave of court to resubmit the matter" (*People v Montanez* at 693). Leave may be granted only once, and the District Attorney is required to justify resubmission (*see* Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 190.75, at 139).

The "one bite rule" restricting the right to resubmit charges to successive grand juries may also apply when the prosecutor withdraws the charges from a grand jury. In *People v Wilkins* (68 NY2d 269 [1986]), the Court of Appeals ruled that a prosecutor may not withdraw a case from one grand jury, after having presented evidence to that grand jury, and then resubmit the case to a second grand jury, unless the prosecutor first receives court authorization for such resubmission. In so ruling, the court concluded that such a withdrawal by the prosecutor is "the equivalent of a dismissal by the first [g]rand [j]ury," and that any subsequent resubmission can only be done with the consent of the court (68 NY2d at 271). In reaching this decision, the court was influenced by the extensive progress that had already been made in the initial grand jury presentation. The court noted that to allow the prosecutor to withdraw a case unilaterally under these circumstances would, in effect, allow the prosecution to forum shop for a more compliant grand jury whenever the initial presentation was not going well (68 NY2d at 275).

The *Wilkins* court makes abundantly clear that the prosecutor's reasons for withdrawing the matter from the first grand jury were irrelevant to the analysis. In *Wilkins*, the prosecutor had presented all of the People's witnesses and was ready to charge the grand jury on the law (68 NY2d at 272). However, the grand jury requested the testimony of two additional witnesses. Unable to locate these witnesses, the People withdrew the case on the last day of the grand jury's term, and resubmitted the case to a second grand jury without leave of court (68 NY2d at 275). Notwithstanding the prosecutor's seemingly good

faith explanation, the court explicitly declared that the Legislature's concern for prosecutorial excess, including forum shopping, made it clear that the prosecutor's reasons were not relevant. In addition, the court noted, to inject the prosecutor's good faith into the analysis would "make a mockery of the legislative command that the District Attorney serve as legal advisor to the [g]rand [j]ury" (68 NY2d at 275). To do so "would allow the prosecutor to circumvent the statutory command that an affirmative official action or decision of the [g]rand [j]ury requires the concurrence of 12 of its members, not the sole whim, or even considered judgment, of the prosecutor" (68 NY2d at 275-276 [internal quotation marks omitted]).

Of course, not every presentment to a grand jury and subsequent withdrawal of a case may be deemed the functional equivalent of a dismissal requiring court permission to resubmit to a second grand jury. The dissent misreads *Wilkins* as holding that "progress should be measured by the People's decision that they have presented all the witnesses and evidence they deem necessary to secure an indictment against a specific defendant or defendants."

*Wilkins* and its progeny, however, make clear that there is no requirement that the prosecution present its entire case for a withdrawal to be deemed a dismissal. Rather, the key factor in determining whether such withdrawal must be treated as a dismissal is the extent to which the grand jury has considered the evidence and the charge (*see Wilkins*, 68 NY2d at 274; *see also People v Gelman*, 93 NY2d 314 [1999]; *People v Cade*, 74 NY2d 410 [1989]). Consistent with *Wilkins*'s policy concern—"that a prosecutor could attempt to circumvent the restrictions on re-presentment without judicial approval by withdrawing a matter from a grand jury prior to a vote in order to submit it to another grand jury, perhaps more receptive to an indictment" (*People v Aarons*, 2 NY3d 547, 552 [2004])—whether a withdrawal must be treated as a dismissal depends on the "extent to which the presentation had progressed—*i.e.*, whether sufficient evidence had been presented for the prosecutor to ask for a vote" (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 190.75, at 141).

Accordingly, where the withdrawal takes place "near the end of the presentation of the evidence," the grand jury may be deemed to have "heard and considered enough to render the withdrawal of the case equivalent to a dismissal" (*Wilkins*, 68 NY2d at 274-275; *Matter of McGinley v Hynes*, 75 AD2d 897

[1980], *revd on other grounds* 51 NY2d 116 [1980], *cert denied* 450 US 918 [1981]). For instance, in *People v Page* (177 Misc 2d 448 [1998]), the People, after presenting evidence to the grand jury, moved to reduce the charges against the defendant. The court accepted the reduction on the condition that the People legally withdraw the case from the grand jury. Because the People did not receive authorization from the court to withdraw the case from the grand jury, the court granted the defendant's motion to dismiss the accusatory instrument. The court rejected the People's contention that their case was not complete, since the People's evidence before the grand jury "consisted of the testimony of a major witness, the complaining witness," and a review of the grand jury minutes indicated "that the [g]rand [j]ury was provided with information that would enable it to decide whether a crime had been committed and whether there existed legally sufficient evidence to establish material elements of the charged crimes" (177 Misc 2d at 452).

Conversely, courts have consistently held that the People's withdrawal of the case was not tantamount to a dismissal where the presentation of evidence is so limited that the grand jury has no ability to consider the charge. For instance, in *People v Gelman* (93 NY2d 314 [1999]), the Court of Appeals held that the first grand jury did not "consider the evidence and the charge" against the defendant since "little evidence of criminal conduct had been presented, and there was no evidence linking defendant to the commission of the crime" (*id.* at 319, 317; *see also People v Rodriguez*, 281 AD2d 375, 376 [2001], *lv denied* 96 NY2d 906 [2001] [given the limited evidence presented, the first grand jury cannot be said to have considered the evidence and the charge to such an extent that the withdrawal of the case must be treated as a dismissal]; *People v Beckwith*, 289 AD2d 956, 957 [2001] [because no evidence against the defendant had been presented, the prosecutor's withdrawal of the case from the grand jury is not deemed a dismissal requiring the People to seek judicial approval before resubmitting to another grand jury]; *People v Skolnik*, 135 Misc 2d 964, 966 [1987] [only two witnesses testified and the evidence presented was merely preliminary and background for introduction of more substantive evidence]).

We must reject the People's argument that the first presentation had not progressed to the point where withdrawal would constitute a dismissal requiring leave to re-present. On the contrary, unlike *Gelman*, the first grand jury heard and

considered sufficient evidence of criminality on defendant's part, including evidence linking defendant to the commission of the charged crimes, to render the withdrawal of the case equivalent to a dismissal (see Wilkins, 68 NY2d at 274-275; McGinley, 75 AD2d at 898; Page, 177 Misc 2d at 452).

While only one witness, the complainant, testified at the first grand jury proceeding, her testimony was legally sufficient to establish the essential elements of the crimes charged. All of the crimes submitted to the grand jury required that the People prove either that Walker sustained serious and permanent disfigurement (see Penal Law § 120.10 [2]), or had been attacked with a "dangerous instrument" (Penal Law § 120.05 [2]; § 120.10 [1]). Walker's testimony that defendant swiped an object in front of her face, hit her while holding the object in her hand, and "cut" her hair causing her to bleed, as well as the display of her "cuts" to the jury, was sufficient to establish that defendant attacked Walker with a dangerous instrument. Although, in the second grand jury proceeding, Smith, Walker's friend, provided corroborating evidence that defendant cut Walker with a razor, it cannot be said that Smith's testimony was "necessary" to establish that Walker had been cut with a dangerous instrument.

In addition, there was sufficient evidence establishing that Walker sustained permanent disfigurement, given (1) Walker's testimony that she immediately went to the hospital after the attack and received 40 stitches; (2) her display of her "cuts" to the grand jury; and (3) the admission of photographs of her cuts indicating the extent of her injuries. While, as the People note, medical evidence was not submitted at the first grand jury proceeding, case law indicates that photographs depicting sutured wounds are legally sufficient to establish, beyond a reasonable doubt, that the wounds resulted in permanent scars (see People v Irwin, 5 AD3d 1122, 1123 [2004], lv denied 3 NY3d 642 [2004]). Moreover, since the standard for indicting a person at a grand jury proceeding is lower than guilt beyond a reasonable doubt (see CPL 190.65 [1]), clearly, the photographs depicting Walker's sutured wounds nine days after the incident were legally sufficient to establish that Walker sustained a permanent disfigurement.

Unlike the dissent, we are not persuaded that the vice inherent in the prosecutor's premature withdrawal of the charges was obviated by the ADA's statement at the outset of the grand jury proceedings that the case would be "continued," and

because she withdrew the case at the end of the grand jury term due to witness unavailability. On the contrary, the prosecutor's desire to present more witnesses to buttress her case is entirely consistent with the need to avoid a grand jury dismissal based on the evidence already presented. More importantly, in *Wilkins*, the Court of Appeals stated that the "good faith" of the prosecutor's withdrawal of the case is irrelevant where, as here, the case has progressed to the point where the withdrawal is tantamount to a dismissal (68 NY2d at 275).

Instead, where, as here, the prosecution has begun a grand jury presentation based on what it deems sufficient evidence to justify the prosecution, but is unexpectedly stymied from completing it prior to the expiration of the grand jury term, its remedy has been clearly spelled out in *Wilkins*. In that situation, all the District Attorney needs to do is request the grand jury's agreement to an extension of its term pursuant to CPL 190.15 (1) (68 NY2d at 276). Should the grand jury not agree, then, as the *Wilkins* court pointed out, "the prosecutor would always have the fallback of obtaining court approval for resubmission, which, if the reasons tendered are indeed legitimate, should be granted" (*id.*). What is not permitted is for the prosecutor to use the device of withdrawing the case in order to get another opportunity to persuade a different, and perhaps more amenable, grand jury that it should indict (*see also People v Cade*, 74 NY2d at 415-416).

Nor do we find any merit to the People's argument that the concerns addressed by *Wilkins* are inapplicable here because defendant was allegedly not the target of the first presentation. While defendants are typically indicted following arrest and filing of a felony complaint, another route that a prosecution may take is for a defendant to be indicted but not arrested until later (*see* CPL 100.05). At the first proceeding, there was a full presentation of a legally sufficient case against both of the alleged participants in the assault; the complainant's account of defendant's conduct cannot be viewed as merely incidental to her testimony against the codefendant. Thus, even though the prosecutor did not "name" Davis as a defendant at the first grand jury proceeding, since the grand jury heard sufficient evidence against her, the withdrawal of the case may be deemed the functional equivalent of a dismissal of the charges against her (*compare People v Dym*, 163 AD2d 150 [1990], *lv denied* 76 NY2d 892 [1990], *with People v Hemstreet*, 234 AD2d 609 [1996]; *People v Almonte*, 190 Misc 2d 783 [2002]).

*Wilkins* has been applied to a situation analogous to this case. In *Hemstreet,* the first grand jury proceeding was investigatory and, after hearing numerous witnesses and receiving several documents into evidence relevant to the guilt of both the defendant and another suspect, the prosecutor asked the grand jury to consider charges as to the other suspect only (*see Hemstreet,* 234 AD2d at 609). After the other suspect was indicted, the People presented the case against the defendant to a second grand jury without seeking permission from the court. Under the circumstances, the court held that since the prosecutor withdrew an "essentially completed" (*id.* at 610) case from the first grand jury, it improperly resubmitted the matter to the second grand jury without leave of court (*id.; see also Almonte,* 190 Misc 2d at 788).

Here, the first grand jury proceeding was not investigatory since the prosecutor stated at the outset of the proceeding that the case was against McIntosh. However, because the grand jury clearly heard evidence against defendant, as in *Hemstreet,* the first grand jury proceeding should be considered a presentation against her. Indeed, the grand jury is "part of the investigatory process" (*People v Waters,* 27 NY2d 553, 556 [1970]), and "is accorded broad investigative powers" (*People v Lancaster,* 69 NY2d 20, 25 [1986], *cert denied* 480 US 922 [1987]). "As an investigatory body its functions are twofold—it seeks to determine if a crime has been committed and who committed this crime" (*People v Filis,* 87 Misc 2d 1067, 1068 [1976]). After hearing and examining the evidence, it may, among other things, "[i]ndict a person" (CPL 190.60 [1]). Accordingly, although the prosecutor did not name defendant at the outset of the first grand jury proceeding, the circumstances implicate the concerns raised in *Wilkins*; based on the extensive incriminating evidence presented against defendant, the grand jury could have taken the affirmative step of taking a vote on whether to indict her, irrespective of the "considered judgment[ ] of the prosecutor" (*Wilkins,* 68 NY2d at 276).

Finally, this Court's holding in *People v Dym* (163 AD2d 150 [1990]) does not compel a different result. In *Dym,* "John Doe" was named in the first grand jury presentation and the People withdrew it after "preliminary background information was presented" (163 AD2d at 150). The defendant was named in the second grand jury presentation which resulted in his indictment. The defendant's accomplice testified for the People in the later proceeding. This Court held that the termination of the

first grand jury proceeding was not a dismissal because "[t]he first proceeding was investigatory rather than specifically directed at the defendant" and "th[e] panel did not hear evidence that a crime had been committed" (*id.* at 154). In contrast, here the grand jury presentation, which was intended to procure an indictment against McIntosh, provided sufficient evidence linking defendant to the commission of the charged crimes to allow the grand jury to take the affirmative step of indicting her as well.

In sum, where, as here, the prosecution has withdrawn an essentially completed case from the grand jury prior to any action having been taken by that body, the result was the functional equivalent of a dismissal under *Wilkins*. Thus, the prosecutor's failure to seek leave of court, pursuant to CPL 190.75 (3), before resubmitting the matter to a second grand jury, rendered defendant's indictment invalid. In view of this determination, we decline to address defendant's remaining arguments.

Accordingly, the judgment of the Supreme Court, New York County (Michael J. Obus, J., at inspection/dismissal motion; Edward J. McLaughlin, J., at jury trial and sentence), rendered March 4, 2008, convicting defendant of assault in the first degree (two counts) and assault in the second degree, and sentencing her to an aggregate term of 9½ years, should be reversed, on the law, and the indictment dismissed, with leave to the People to apply for an order permitting resubmission of the charges to another grand jury.

CATTERSON, J. (dissenting). Because, in my opinion, there was no procedural violation by the People in their withdrawal and subsequent resubmission of a case to the grand jury without leave of court, I would uphold the defendant's conviction on two counts of assault in the first degree and one count of assault in the second degree. In this case, the defendant, Makeda Davis, and a second defendant, Fayola McIntosh,[1] disfigured a neighborhood acquaintance by slashing her face with razor blades. The defendant asserts a violation of CPL 190.75 (3) in that the People resubmitted her case to a second grand jury without leave of court, and so argues that her conviction must be vacated and the indictment dismissed.

The facts adduced at trial as to the assault are as follows: In

---

1. McIntosh's motion to sever the indictment was granted. She was subsequently convicted, after a jury trial, of second-degree assault and sentenced to a term of five years.

the early hours of June 11, 2006, the victim, Lynn Walker, and the defendant argued at a Manhattan nightclub over a man the defendant claimed she had married. Subsequently, the defendant raised her hand and waved a razor blade in front of Walker's face. When Walker hit back in an attempt to defend herself, the defendant struck her with the razor blade on the left side of her face. Walker felt the blade "dr[ag] down the side of [her] face" from her "scalp down the whole side of [her] temple" to the outer end of [her] left eye." She then felt the blade move diagonally to the bottom of her left ear.

McIntosh also had a razor blade and struck Walker with it while the defendant continued her attack. At that point, Walker "couldn't see what was going on anymore" because she "started bleeding heavily" and the skin that had been cut over her left eye was "peeling and dropping" so that it covered her eye.

One of the friends who was at the club with Walker testified at trial that she observed the defendant and McIntosh cut Walker with razor blades. Heather Norden, a paramedic who subsequently arrived on the scene, testified that Walker's injuries were "pretty gruesome," and that Walker was "covered in blood" and had "deep" facial lacerations, with her skin split "wide open." According to Norden, Walker received 40 stitches at St. Vincent's Hospital. Walker testified that her injuries were very painful and that she had "bad" scars for almost a year after the incident. She further testified that, at the time of trial, the scars still looked bad to her.

The defendant also testified at trial, and denied cutting Walker's face or encouraging anyone to cut Walker. The defendant further denied striking Walker. At the conclusion of the four-day trial, the jury found the defendant guilty on all counts as charged.

The defendant argues that her conviction should be vacated on the grounds that, inter alia, the People improperly resubmitted the case against her to a second grand jury without leave of court in violation of CPL 190.75 (3). Specifically, she contends that since the People's case was essentially complete at the time that it was withdrawn from the first grand jury, the withdrawal constituted a dismissal of the charges, and thus the People were required to obtain leave to re-present the case to the second grand jury.

I disagree, and for the reasons set forth below would affirm the judgment of conviction. It is well established that pursuant to CPL 190.75 (3), "[w]hen a charge has been . . . dismissed, it

may not again be submitted to a grand jury unless the court in its discretion authorizes or directs the people to resubmit such charge to the same or another grand jury." However, it is equally well established that only certain withdrawals by the People are tantamount to a dismissal under the statute. (*People v Wilkins*, 68 NY2d 269, 273 [1986].)

In *Wilkins*, the Court held: "the key factor in determining whether an unauthorized withdrawal of the case must be treated as a dismissal is the extent to which the Grand Jury considered the evidence and the charge." (68 NY2d at 274.) The standard is the "extent to which the presentation had progressed—*i.e.*, whether sufficient evidence had been presented for the prosecutor to ask for a vote." (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 190.75, at 141.) If "little evidence of criminal conduct ha[s] been presented, and there [is] no evidence linking defendant to the commission of the crime," then the prosecutor need not seek judicial approval to resubmit the charges to a second grand jury after the matter is withdrawn from the first. (*People v Gelman*, 93 NY2d 314, 317 ]1999]; *see also People v Rodriguez*, 281 AD2d 375, 376 [1st Dept 2001], *lv denied* 96 NY2d 906 [2001].)

The Court of Appeals has noted that the prosecutor's "presentation need not be complete for consideration equivalent to a dismissal to occur." (*Wilkins*, 68 NY2d at 274.) Where the withdrawal takes place "near the end of the presentation of the evidence," the grand jury may be deemed to have "heard and considered enough" to render the withdrawal the equivalent of a dismissal. (68 NY2d at 274-275; *see also Matter of McGinley v Hynes*, 75 AD2d 897 [2d Dept 1980], *revd on other grounds* 51 NY2d 116 [1980], *cert denied* 450 US 918 [1981].)

In *Wilkins*, the Court of Appeals held that the prosecutor's withdrawal of the case from the first grand jury was the equivalent of a dismissal since, "*as far as the prosecutor was concerned*, all witnesses had testified, and all that was left was to instruct the Grand Jury on the law." (68 NY2d at 275 [emphasis added].)

As a threshold matter, then, precedent does not support the majority's view that the key factor in determining whether the presentation has progressed far enough is whether the People have presented sufficient evidence on which to indict any one defendant. Rather, progress should be measured by the People's decision that they have presented all the witnesses and evidence

they deem necessary to secure an indictment against a specific defendant or defendants.

In the instant case, in my opinion, the facts do not support the majority's conclusion that the withdrawal by the People was tantamount to a dismissal: The prosecutor first appeared before the grand jury on June 20, 2006, just nine days after Walker was assaulted, to present the People's case against Fayola McIntosh, not the defendant in the instant appeal. The Assistant District Attorney (ADA) submitted three felony charges, two counts of assault in the first degree (Penal Law § 120.10 [1], [2]) and one count of assault in the second degree (Penal Law § 120.05 [2]). The ADA immediately advised the grand jurors that, while they would hear from Walker that day, the case would be "continued."

Walker then testified that she was assaulted by the defendant and McIntosh at the nightclub. In particular, Walker testified that the defendant had "swiped something at [her] face." When the ADA asked Walker what exactly she had seen, Walker replied, "I really didn't see exactly what it was. It was just some type of object in her hand."

According to Walker, after defendant swiped the object at her face, she "grabbed [Walker's] hair" and started "punching" her "on the left side of [her] face." Walker then testified that McIntosh "came over" and started "hitting [her]" as well. Walker stated that she did not see anything in McIntosh's hand. Next, Walker testified that after a crowd gathered, "[defendant] cut [her] hair" and Walker "felt a lot of blood running down [her] face."

According to Walker, immediately after the incident, she went to the hospital and received 40 stitches to her forehead, the left side of her face, "behind [her] ear," as well as a liquid stitch on her hand. Walker then took off her head scarf and showed the grand jury her injuries, specifically pointing to her "cut[s]." Photographs of Walker's "cuts" taken the day of the grand jury proceedings were submitted into evidence.

Walker was excused and no further evidence was presented. Three days later, Makeda Davis, the defendant, turned herself in and was arrested. Seven days later, on June 30, 2006, the last day of the grand jury's term, the ADA advised the grand jurors that she was withdrawing the case due to "witness unavailability."

Approximately four months later, in October 2006, the ADA, without requesting judicial leave, appeared before a second

grand jury to present evidence in the case, this time against both the defendant and McIntosh. The same three felony charges from the first grand jury were submitted to the second grand jury.

Walker again testified about the assault and stated that defendant "swiped an object in front of [her] face." When asked whether she could see what the object was, Walker replied, "Not really. I mean, it looked like some type of blade, but I couldn't really see it because she did it real fast, like jumping at me."

When the prosecutor asked Walker what she "fe[lt]" when she was being "struck," Walker replied, "when [defendant] hit me on the side of my face, I just felt, like a drag . . . It didn't feel like she hit me. And that was it. I felt it kind of drag. And the same thing, really, . . . on this side of my face when Fayola ran over." Walker indicated that she "started getting a little blurry" and "pretty much started bleeding after that."

The rest of Walker's testimony was similar to her testimony before the first grand jury, except that she indicated that she had scarring rather than "cuts" and that her scars were still visible. The photographs of Walker's injuries, taken nine days after the incident, were again admitted into evidence.

In addition to Walker's testimony, two other witnesses testified before the second grand jury. Dr. Sandra Haynes, an attending physician at St. Vincent's Hospital, testified that on the day of the incident she examined and treated Walker. Dr. Haynes indicated that she had reviewed Walker's medical records pertaining to her treatment at St. Vincent's, and the records were admitted into evidence. Dr. Haynes described Walker's injuries and treatment, which included stitches, and testified that, with "a reasonable degree of medical certainty," Walker's lacerations "were consistent with injury caused by a sharp instrument." When asked what the possible long-term effects were from those lacerations, Dr. Haynes replied that Walker would have "permanent scarring."

Walker's friend, Barbara Smith, also testified at the second grand jury proceedings that she observed the defendant and McIntosh cut Walker with razors. After the second grand jury presentation, both the defendant and McIntosh were indicted on the two counts of first-degree assault and the single count of second-degree assault.

In my view, the People are correct in asserting there was insufficient evidence for the first grand jury to consider in order

to make a decision about essential elements of the crimes with which defendant was being charged. I depart from the majority's determination that the type of *extensive* progress required by the *Wilkins* Court was made in this case. In *Wilkins*, the prosecutor had presented all of the People's witnesses and was ready to charge the grand jury. In this case, the prosecutor made it quite clear from the very beginning that she could not present all her witnesses and that she would have to continue the presentation. Without the testimony of a medical expert, Dr. Haynes, and without the admission of victim's hospital records, the People would have been hard pressed to establish the essential element of "serious[ ] and permanent[ ]" disfigurement required for assault in the first degree pursuant to Penal Law § 120.10 (2). Equally doubtful is the likelihood they would be able to establish that the defendant used a "dangerous instrument" pursuant to Penal Law § 120.10 (1) without the testimony of Walker's friend who testified to seeing the razor blades.

I disagree with the majority that the victim's testimony alone was sufficient to establish the essential elements of the crimes charged. Nothing in Walker's testimony, including that the defendant swiped an object in front of her face, would necessarily lead to a finding that the defendant used a blade rather than, for example, that she was wearing a large ring that got in the way as she was raining blows on the victim. Further, the majority relies on *People v Irwin* (5 AD3d 1122 [4th Dept 2004], *lv denied* 3 NY3d 642 [2004]) to contend that photos taken nine days after the assault and depicting Walker's sutured wounds were legally sufficient to establish that she sustained permanent disfigurement. I find the reliance is misplaced. The fact that in *Irwin* there was a photograph from which it could be inferred that the depicted sutured wounds would result in permanent scarring does not mean that the same necessarily would be or could be inferred from a photograph of Walker's sutured wounds. Not all sutured wounds are equal. Not all sutured wounds necessarily result in permanent disfigurement, but rather that result depends on numerous factors such as the skill of a surgeon and the elasticity of an individual's skin, as well as the depth, severity and location of the wound. A grand jury viewing "cuts" a mere nine days after the attack might not necessarily be convinced, however "gruesome" the cuts appeared so soon after the assault, that the damage would be permanent

or protracted.[2] It is also a fact that where case law reflects findings of permanent disfigurement by the trier of fact, those findings are reached at trials which are usually held months, if not years, after the alleged assaults and where such finding depends in great measure on the fact that the scars are evident on the victim. (*See People v Wade*, 187 AD2d 687 [2d Dept 1992], *lv denied* 81 NY2d 894 [1993] [scars evident eight months after attack]; *People v Allen*, 165 AD2d 786 [1st Dept 1990], *lv denied* 76 NY2d 983 [1990] [scars evident two years after attack].)

In any event, in this case, it is apparent that the re-presentation had nothing to do with the abuse which CPL 190.75 (3) was designed to prevent, that is, forum shopping for a more amenable grand jury. The defendant now suggests that the prosecutor withdrew the case because "she was dissatisfied with the evidence" and "feared" the outcome of a vote. That suggestion is refuted, as the People assert, by the announcement at the start of the first grand jury presentation—before any evidence whatsoever was presented—that the case would be continued, which was before the People could glean any kind of reaction, positive or negative towards their case.

More recently, the Court of Appeals specifically rejected the notion that withdrawal would equate with dismissal "whenever the People present *any* evidence to a Grand Jury of criminal conduct." (*People v Gelman*, 93 NY2d at 319.) In that case, the Court reiterated and clarified its holding in *Wilkins* by stating unequivocally that, in *Wilkins*, withdrawal was treated as a dismissal because " 'the first presentation was, *as far as the prosecution was concerned, complete*' and '*all witnesses* had testified.' " (*Id.*, quoting *Wilkins*, 68 NY2d at 274-275 [some emphasis added].)

In other words, unlike the majority, I believe the view of the People should prevail as to whether a presentation to a grand jury is complete. In this case, there should have been no doubt that the view of prosecution was that its presentation was not complete against McIntosh, and certainly not against the defendant.

I further would reject the defendant's argument that the indictment should be dismissed on the grounds the People breached their duty of fair dealing by failing to introduce in the

---

2. It is worth noting that, at trial, the defendant asserted legal insufficiency of evidence as to the severity of injuries on the basis that no medical testimony was presented to establish permanency of the scarring.

second grand jury proceedings Walker's purported "exculpatory" testimony from the first grand jury proceedings. Specifically, the defendant asserts that the prosecutor should have introduced testimony from the first grand jury proceeding that included the statement that defendant held "some type of object in her hand," but Walker "really didn't see exactly what it was"; and that defendant "did not touch [Walker] with [the object]."

I find that the testimony is not so radically different that its omission from the second grand jury presentation constitutes sufficient prejudice to the defendant such as to render the grand jury proceeding defective. (*See* CPL 210.20 [1] [c]; CPL 210.35 [5].) The statutory test for finding a proceeding defective is "very precise and very high" and is not satisfied by a showing of "mere flaw, error or skewing" of the evidence. (*People v Darby*, 75 NY2d 449, 455 [1990].)

Indeed, while the prosecutor "owes a duty of fair dealing to the accused and candor to the courts" (*People v Pelchat*, 62 NY2d 97, 105 [1984]), "[t]he People generally enjoy wide discretion in presenting their case to the Grand Jury and are not obligated to search for evidence favorable to the defense or to present all evidence in their possession that is favorable to the accused." (*People v Lancaster*, 69 NY2d 20, 25-26 [1986], *cert denied* 480 US 922 [1987] [citation omitted].)

Lastly, in my view, the defendant was not prejudiced by the People's failure to disclose the purportedly exculpatory statements. Even without Walker's testimony, the second grand jury had sufficient evidence to indict defendant. Indeed, Smith testified that she observed the defendant attacking Walker with a razor, and Dr. Haynes indicated that Walker's lacerations had been caused by "a sharp instrument" and would result in permanent scarring.

SWEENY and FREEDMAN, JJ., concur with RENWICK, J.; FRIEDMAN, J.P., and CATTERSON, J., dissent in a separate opinion by CATTERSON, J.

Judgment, Supreme Court, New York County, rendered March 4, 2008, reversed, on the law, and the indictment dismissed, with leave to the People to apply for an order permitting resubmission of the charges to another grand jury.